**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Jamie Lombardo** and **Alexander Mercado**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**Chobani, LLC**,<br><br>Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMANDED** |

<u>Introduction</u>

Plaintiffs, Jamie Lombardo ("Lombardo") and Alexander Mercado ("Mercado", with Lombardo, "Plaintiffs"), for their Class Action Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, based upon counsel's due diligence investigation, publicly available documents, and the conduct and statements of Defendant Chobani, LLC ("Chobani" or "Defendant").

1. Plaintiffs bring this action ("Action") on behalf of themselves and all others similarly situated ("Class", "Class Members") against Defendant arising from its deceptive acts and practices and false advertising in connection with its sale of Chobani's 32 ounce "20 G Protein" yogurt ("20G Yogurt").

2. Chobani is a major American food company best known for popularizing Greek-style yogurt in the United States. Founded in 2005 by Turkish immigrant Hamdi Ulukaya, the

brand significantly impacted the U.S. dairy aisle by introducing thick, high-protein strained yogurt made without artificial preservatives.

3. The latest battle in the yogurt wars between Chobani and its competitors, such as Danone, however, is the production of high protein yogurts.

4. With the advent of weight reduction drugs, such as GLP-1 and Ozempic, consumers are eating smaller quantities of food. The amount of protein in each serving of food has thus become a mainstream selling point fueled by media-centric wellness trends and fitness culture. The International Food Information Council's 2024 Food and Health Survey found that 71% of American consumers were trying to eat more protein.

5. High protein has become a marketing staple. The amount of protein per serving is now prominently featured on food product packaging and increasingly shapes purchasing decisions across categories of foods ranging from yogurt and snack bars to powders and supplements.

6. Twenty grams of protein is considered the amount that muscle protein is maximized in young adults with an intake of about 20-25 grams of high quality protein.[1] Thus, in recent years, 20 grams of protein has become the crucial threshold driving consumer purchasing interest across a range of foods including yogurt.

7. Protein content further drives greater spending with a high protein claim commanding a price premium of up to 12%.[2]

---

[1] Brad Jon Schoenfeld, Alan Albert Aragon, Journal of Int. Sports Nutr., *How much protein can the body use in a single meal for muscle-building?: Implications for daily protein distribution* (Feb. 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5828430/.

[2] Corey Geiger, et al., *Dairy Poised to Help Meet Consumers' Growing Demand for Protein*, Cobank (Jan. 23, 2026), http://www.cobank.com/web/cobank/knowledge-exchange/dairy/dairy-poised-to-help-meet-consumers-growing-demand-for -protein (citing Circana market research).

8. Chobani was well aware of this consumer trend. In December 2024, for instance, it released a survey in which it specifically found that 85% of Americans wanted to increase their protein intake, but that they lacked knowledge around this macronutrient.[3]

9. Taking advantage of that consumer trend and consumers' general lack of knowledge, Chobani introduced a new line of high protein offerings, including its 20G Yogurt.

10. Chobani called its new yogurt offering "20G Protein", and featured 20G prominently on the label of both its individual serving sized containers and its 32 ounce containers, representing to reasonable protein conscious consumers that each serving of that yogurt contained 20 grams of protein.

11. Chobani, however, could not produce yogurt which contained 20 grams of protein in an average serving. The only means through which it could justify the 20G label was to increase the individual serving size beyond the average serving size allowable under U.S. Food and Drug Administration ("FDA") regulations.

12. The average serving size for a single container of yogurt is 5.2 ounces. Yogurts produced by Danone, Trader Joe's, siggi and Fage, for instance, all sell their individual yogurts in 5.2 ounce sizes.

13. Chobani is unable to produce a yogurt that contains 20G of protein in one 5.2 sized serving, and likely is unable to strain its yogurt so that it can produce a single 5.2 ounce serving of yogurt containing the important 20 grams of protein.

[3] Chobani, *Americans are Prioritizing Protein Now More than Ever, but Study Shows Significant Gaps In Nutrition Knowledge* (Dec. 4, 2024), https://www.chobani.com/newsroom/our-news/americans-are-prioritizing-protein-now-more-than-ever-but-study-shows-significant-gaps-in-nutrition-knowledge.

14. In order to justify the 20G label for it single serving yogurt, therefore, Chobani had to increase the container to 6.7 ounces—a size beyond the average size of a single sized yogurt. Consequently, Chobani's individual serving sized container of 20G yogurt, purportedly containing 20G of protein per serving, contains 6.7 ounces of yogurt.

15. Under FDA regulations, yogurt producers are granted discretion in determining the size of a "serving" in a single container.

16. However, when it comes to multiple-serving tubs, in particular Chobani's 32 ounce serving size of its 20G Yogurt, Chobani engages in outright misrepresentations directed at misleading the reasonable consumer.

17. If Chobani followed the FDA's serving size rules for multiple serving containers, the 32 ounce sized Chobani product would be able to claim only 18 grams of protein per serving, below the 20 gram threshold, and below the threshold that the reasonable consumer is led to believe the yogurt contains through its mislabeling and advertising.

18. Moreover, although the label indicates that the 32 ounce sized 20G Yogurt contains 5 servings (of 6.7 ounces), in fact, Chobani does not increase the amount of yogurt in its 32 ounce sized yogurt.

19. Rather, Chobani inflates the size of each of its serving in violation of FDA regulations.

20. Consumers reasonably expect that Chobani will display the true and correct amount of protein per serving on the Chobani's 20G Yogurt labels, packaging and advertising. It does not do so. Had Chobani included statements of the accurate amount of protein per serving as it was required to do, it would have disclosed that the Chobani 20G Yogurt contains significantly less protein per serving than represented. That information is material to reasonable consumers.

21. Defendant's mislabeling of its 20G Yogurt is deceptive and misleading to reasonable consumers who believe that they are paying for and purchasing yogurt that contains 20 grams of protein in each average sized serving. Defendant's misleading and deceptive labelling, packaging and advertising has caused reasonable consumers to pay a price premium for yogurt that they believe contains more protein per serving that it actually does.

22. Plaintiffs and Class Members have thus been misled and damaged by Chobani's deceptive and misleading conduct and its false advertising, and seek damages on behalf of themselves and Class Members, including for the price premium they have paid for 20G Yogurt. They also seek to enjoying this misleading labeling and advertising.

## Parties

23. Plaintiff Jamie Lombardo is an individual domiciled in Pompano Beach, Florida, and purchased Chobani's 20G Yogurt.

24. Plaintiff Alexander Mercado is an individual domiciled in Bronx, New York, and purchased Chobani's 20G Yogurt.

25. Chobani is a limited liability company organized under the law of the State of Delaware, and is a wholly owned subsidiary of Chobani Global Holdings, LLC, a private Delaware limited liability company.

26. Chobani markets and sells Chobani yogurt from its headquarters located at 200 Lafayette Street, New York, New York. Chobani markets and sells yogurt, oat milk, and dairy creamers in New York and throughout the United States. By sales, it is one of the top yogurt makers in the United States.

## Jurisdiction and Venue

27. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because the Defendant is diverse at least one Class member, the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more members of the Class.

28. This Court has personal jurisdiction over Chobani because its global business headquarters is located in this District, and many of the acts and occurrences that give rise to the claims asserted herein arose in the District. Moreover, Chobani regularly and systematically transacts business in New York, including through the sale, distribution, and advertisement of its products.

29. Venue is proper in this District pursuant to 28 U.S.C.§1391(b)(2) because a substantial part of the events giving rise to these claims asserted herein occurred in this District.

**Factual Allegations**

**Chobani Responds to "Proteinmania"**

30. Over the past several years, Americans have become obsessed with protein. As one article announced, "proteinmania" has taken over the grocery store.[4] According to a national survey from the International Food Information Council from 2024, 71% of American consumers reported that they are actively seeking to try to increase their protein intake, up from 59% in 2022.[5]

[4] Chris Gayomali, New York Magazine, *Big Food Gets Jacked: How Protein Mania Took Over the American Grocery Store* (Feb. 10-23, 2025), https://www.magzter.com/stories/lifestyle/New-York-magazine/BIG-FOOD-GETS-JACKED.
[5] Da Eun Kim, et al,. *Added Protein, Added Value? Consumer Demand for Protein Labels Across Product Types, Flavors, and Consumer Segments*, 139 Food Quality & Preference. May 2026.

31. The volume of United States' sales of products labeled as protein rich grew by about 5% in 2025 compared with 2024. *Id.*

32. An industry report highlighted the phenomenon as "proteinmania" saying that protein was in "every supermarket aisle." *Id.*

33. The increased demand for protein dense food products has been further fueled by the Trump Administration's flipping of the food pyramid so that protein, dairy and healthy fats (as well as vegetables and fruits) are at the top of the pyramid, while whole grains are at the bottom.[6]

34. These new guidelines promulgated in January 2026 by the U.S. Department of Health and Human Services and Agriculture, materially shifted the recommended macronutrient composition recommending an increase in protein intake by 50 to 100% depending upon body weight, without increasing calories.[7] The Guidelines specifically advise consumers to "prioritize protein food at every meal". *Id.*

35. Food labels can impact consumers' perceptions of a product, including its healthfulness and naturalness, and research has shown that food labels can incorrectly lead consumers to believe that products are healthier than they are, increasing demand. *Id.*

36. That is particularly true of labels concerning protein content. For those labels, literature has found that consumers perceive products with these claims to be healthier. *Id.*

---

[6] Ryan Deer, *New Dietary Guideline Push Protein, Nix Sugar*, Fitt/Insider (Jan. 7, 2026), New Dietary Guidelines Push Protein, Nix Sugar | Fitt Insider.

[7] U.S. Dept. of Health & Hum. Serv. & U.S. Dep't. of Agriculture, *Dietary Guidelines for Americans*, 2025-2030, http://cdn.realfood.gov/DGA.pdf.

37. Protein rich foods, once marketed primarily to athlete and fitness buffs, have become a major mainstream selling point.[8] Food products now prominently feature protein counts per serving on product packaging and increasingly informs purchasing decisions, including those pertaining to yogurt. *Id*. Moreover, foods with high protein claims on the label can command a price premium as high as 12%.[9]

38. Twenty grams of protein per serving has emerged as the new consumer baseline globally.[10] Consumers regularly evaluate a food's protein content by consulting the number of grams of protein in a single serving.[11] Grocery shelves are stocked with products touting 20 grams of protein per serving as a major selling point, as demonstrated below:




---

[8] The Fashion Law, *The Protein Wars Are Moving into Co*urt (July 29, 2026), https://www.thefashionlaw.com/the-protein-wars-are-moving-into-court-lawsuit/.

[9] *Dairy Poised to Help Meet Consumers' Growing Demand for Protein, supra.*

[10] Libby Hargreaves, *High-Protein Yoghurt: Danone's Supply Chain Answer to GLP-1*, SupplyChainDigital (Feb. 20, 2026), https://supplychaindigital.com/news/protein-yoghurt-danone-supply-chain-answer-glp-1.

[11] *American's Perceptions of Protein*, Int'l Food Information Council (July 2025), https://ific.org/wp-content/uploads/2025/07/IFIC-Spotliught-Survey-Protein-Perceptions.pdf.

39. Consumers' preference for food products with 20 grams of protein per serving was not lost on Chobani. In a December 2024 survey that it conducted, Chobani found that 85% of Americans wanted to increase their protein intake and wanted to incorporate more protein into their diets in the coming year but that they lacked the knowledge to do so.[12] One of the conclusions to Chobani's survey was that Greek yogurt was a great source of protein to help Americans make that shift. *Id*.

40. In light of that conclusion, Chobani determined to rebrand its "Cobani Complete" yogurt line to emphasize the 20 grams of protein that was the threshold that attracted most consumers.[13]. Although its Chobani Complete line presumably contained complete nutrition, in order to align with consumers' feedback, Chobani rebranded its line to focus on the 20 grams or more of protein contained in an average serving of the product. *Id*.

41. Upon information and belief, however, Chobani did not have the ability to manufacture dense enough yogurt so that an average serving of its purportedly protein rich yogurt (in accordance with FDA regulations), would yield an average serving containing 20 grams of protein.

42. Upon information and belief, in the past, Chobani has tried and failed to manufacture dairy products that could legitimately compete in the ultra-high protein category. In February 2022, for instance, Chobani launched its "Ultra-Filtered Milk" product, which touted

[12] *Americans are Prioritizing Protein Now More than Ever, but Study Shows Significant Gaps In Nutrition Knowledge, supra.*

[13] Deniz Ataman, *Chobani bets big on protein in yogurt and RTD coffee*, Food Navigator (Mar. 24, 2025 at 13:24 GMT), https://www.foodnavigator.com/Article/2025/03/24/chobani-features-protein-rich-yogurt-and-drinks-at-expo-west/.

"20G Protein" on the front label. It discontinued that product three months later following consumer feedback that the milk was "horrible', "thick", "syrupy", "sour" and like "goo".[14]

**Regulatory Background**

43. Since 1993, regulations promulgated by the FDA have provided a standardized basis for determining serving sizes on product labels—and, accordingly, the denominators for per-serving nutrient-content claims.

44. At the time it enacted these regulations, FDA recognized that standardization of serving sizes was necessary to "reduce [consumer] confusion"[15] and ensure that food label claims "are not misleading to consumers."[16] According to the House Report that prompted these regulations, the non-standardized serving-size information previously provided by manufacturers was "extremely misleading," since consumers had no objective way to compare different products and determine which one was actually more nutrient-dense.[17] T h e FDA's goal in adopting these regulations was to ensure that nutrition claims "were the result of the characteristics of the food and ***not*** of manipulation of the serving size."[18]

45. To implement serving-size standardization, the FDA determined "reference amounts customarily consumed" ("RACC") for numerous foods, which signify the amount of a given food typically eaten in one sitting. For yogurt, the RACC is 170 grams.[19] Notably, the

[14] Elaine Watson, *Chobani Discontinues Ultra-Filtered Milk Three Months After Launch*, FoodNavigatorUSA (Apr. 26, 2022), https://www.foodnavigator.com/Article/2022/04/26/Chobani-discontinues-ultra-filtered-milk-three-months-after-launch/.
[15] 58 Fed. Reg. 2235-36 (Jan. 7, 1993).
[16] 58 Fed. Reg. 60421-01 (Nov. 27, 1991).
[17] 58 Fed. Reg. 2235-36 (quoting H. Rep. 101-538, 101 st. Cong., 2d sess. 18 (1990)).
[18] 56 Fed. Reg. 60421-01 (emphasis added).
[19] 21 C.F.R. §101.12. The 170 gram RACC for yogurt was set in May 2016. *See* 81 Fed. Reg. 34000-01 (May 27, 2016).

RACC is ***not*** the same thing as the serving size—but it does play a critical role in calculating serving sizes.

46. Because 20G yogurt are sold in bulk in 32 ounce containers, the serving size must be the amount expressed in common household measure that most closely approximates the 170-gram reference amount.

47. When cups are the appropriate household measure, as here, the serving size must be expressed in increments of either ¼ or 1/3 of a cup. Thus the permitted servings sizes must be expressed as a ½, 2/3, or ¾ of a cup and Chobani must select the permitted increment that most closely approximates the applicable 170-gram reference amount.

48. The serving size must further be followed by its equivalent metric quantity in grams. That metric quantity represents the amount of product contained in the properly determined household serving measure and provides the basis for the amount of nutrient declared per serving.

49. Federal regulations require the grams of protein in a serving to be stated to the nearest whole gram.

<u>Chobani Inflates its Serving Size</u>

50. Chobani's back label declares that a serving size of its yogurt is ¾ of a cup, or 190 grams, when in the 32 ounce tub. It then uses that declared serving size to state that the yogurt contains 20 grams of protein per serving.

51. However, based upon Chobani's own admission that 190 grams of yogurt constitutes ¾ of a cup, the RACC of 170 grams (the average serving) is equal to approximately 0.67 cups.

52. Under the FDA's serving size rules, 0.671 cups should be rounded to the closest permitted cup increment. The closest permitted cup increment is 2/3 of a cup, not ¾ of a cup.

53. Thus, the properly calculated serving size for the yogurt is 2/3 of a cup, with an equivalent metric quantity of 169 grams.

54. Calculating the nutritional value based upon Chobani's own label that 190 grams of yogurt contain 20 grams of protein, demonstrates that a 169 gram serving has only 17.8 grams of protein.

55. In other words, Chobani is unable to produce a sufficiently protein rich yogurt in which a required serving of 2/3 of a cup contains 20 grams of protein.

56. Instead, it misleads reasonable consumers by inflating the size of a serving so that it can justify labeling its product as containing 20G or 20 grams of protein per serving , and can advertise that its product contains 20 grams of protein per serving on the front label.

57. Reasonable consumers are thus misled into believing that in order to obtain 20 grams of protein, they need only eat an FDA required average serving size of yogurt rather than an inflated serving.

58. By using the inflated 190 gram serving size and then labeling its yogurt 20G, Chobani misleads consumers into believing that its yogurt is more protein dense than it is and that it is as protein dense as the yogurt competitors whose yogurt actually provides 20 grams of protein per a 170 gram serving thus preventing consumers from being able to compare various products.

59. The difference between 18 grams and 20 grams of protein is material to consumers seeking to maximize their protein intake, particularly to those who are seeking to limit their calories and maximize their protein intake with smaller portions, such as those on weight loss medications.

60. Reasonable consumers are not expected to know or understand the RACC references for yogurt and thus cannot be expected to understand that Choban's label with 190 grams per serving does not comply with FDA regulations or the average size serving of yogurt.

61. Chobani's misleading label further prevents consumers from being able to make accurate comparisons of different products and causes them to pay a premium for nutrient or protein rich yogurt that they are not getting.

62. Applying FDA rules correctly, Chobani's label should thus state that it contains less than 18 grams of protein per average serving.

63. Chobani's labels are intended to and do deceive reasonable consumers about whether they will consume 20 grams of protein in an average sized serving, and as to the protein density of Chobani's product.

64. Had Plaintiffs and Class members known that the 20G Yogurt does not contain 20 grams of protein per properly calculated serving, they would not have purchased the yogurt, and/or would not have paid the price for it that they did.

65. As a result of Chobani's unlawful, false, misleading and deceptive labeling and advertising, Plaintiffs and Class members did not receive the benefit of their bargain and paid for a product that was worth less than as represented.

Class Action Allegations

66. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

67. Plaintiffs bring this action on behalf of themselves and on behalf of the following Class and Subclasses:

Nationwide Class

All persons who purchased Chobani 20G Yogurt in a 32 ounce container, within the applicable statute of limitations, in the United States.

New York Subclass

All persons, who purchased Chobani 20G Yogurt in New York, within the applicable statute of limitations.

Florida Subclass

All persons, who purchased Chobani 20G Yogurt in Florida, within the applicable statute of limitations.

68. Excluded from the Class and Subclasses are Chobani, its officers, directors, agents, employees, predecessors, successors, affiliates, partners, subsidiaries, general partners, and any judge or court personnel presiding over the Action.

69. Plaintiffs reserve the right to amend or refine the definition of the Class and Subclasses or to propose additional class or subclasses based upon information obtained through discovery.

70. Numerosity: The members of the Class are so numerous that joinder of each Class member is impracticable. Upon information and belief, about 13 million households purchase Chobani's high protein products annually, of which the 32 ounce sized yogurt is a substantial percentage.

71. Commonality: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law and fact include, *inter alia*:

(a) Whether Chobani engaged in the illegal conduct alleged herein;

(b) Whether the container for Chobani's 20G Yogurt contains a misleading label;

(c) Whether reasonable consumers were deceived by Chobani's labelling and container;

(d) Whether Plaintiffs and Class Members paid more for Chobani's 20G Yogurt as a result of its labeling;

(e) Whether Plaintiffs and Class Members suffered damage from Chobani's misleading labeling;

(f) Whether Chobani retained an unjust benefit conferred by Plaintiffs; and

(g) Whether Plaintiffs and Class Members are entitled to declaratory and/or injunctive relief.

72. Typicality: Plaintiffs claims are typical of the claims of Class Members because they were affected by the same misleading labels, and their claims are based upon the same legal theories.

73. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Their interests are aligned with those Class Members, they are committed to the prosecution of this Action and they have retained counsel experienced in consumer and class action litigation. Plaintiffs are not aware of any conflict that would prevent them from adequately representing the Class.

74. Ascertainability: Membership in the Class can be determined through objective criteria, including Chobani's records, the records of various food outlets and stores, and other entities that sell or distribute Chobani products.

75. Predominance: The common questions arising from Chobani's conduct predominate over any individual issues and will be established through evidence common to Class Members.

76. Superiority: A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages sustained by individual Class Members may be insufficient to justify the expense and burden of separate litigation, even though the aggregate harm caused by Chobani's conduct is substantial.

77. Separate actions would require duplicative discovery concerning the same labels and would create a risk of inconsistent rulings concerning Chobani's conduct. Class treatment will conserve judicial resources and permit Class Members to pursue claims that might otherwise go unredressed.

78. Rule 23(b)(2). Additionally, Chobani has acted or refused to act on grounds generally applicable to the Class and Subclasses through its labeling so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole. Chobani has directed its conduct to all consumers in a uniform matter. Chobani still represents that its yogurt contains 20 grams of protein per average serving. Therefore, injunctive relief on a class wide basis is necessary to prevent Chobani's misconduct from causing continuing harm to Plaintiffs and Class Members.

## Causes of Action

### Count I
### Violations of New York GBL §349
### (On behalf of the Plaintiff Mercado and the New York Subclass)

79. Plaintiff Mercado repeats and realleges each and every allegation above as if fully set forth herein.

80. New York General Business Law Section 349 makes unlawful "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of a service in this state."

81. Defendant is a "person, firm, corporation or association or agent or employee" withing the meaning of N.Y. Gen. Bus. Law §349(b).

82. At all times relevant, Defendant engaged in "business", "trade" or "commerce" withing the meaning of N.Y Gen. Bus. Law §349(a).

83. Plaintiff Mercardo and the members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law §349(h).

84. At all times relevant, Defendant engaged in trade and commerce within the State of New York and provided products to customers throughout the State of New York, including Plaintiff Mercado and members of the New York Subclass.

85. Defendant engaged in deceptive acts and practices in the conduct of any business, trade or commerce in New York, in violation of N.Y. Gen. Bus. Law §349, including by selling mislabeled goods in New York.

86. Defendant's conduct was consumer-oriented because Defendant marketed and provided yogurt products to the general public and made representations about those goods.

87. Defendant represented to customers that its 20G Yogurt contained 20 grams of protein per average serving as calculated under FDA regulations.

88. These representations were material to consumers who were concerned about their protein intake and the amount of yogurt that they needed to consumer to obtain 20 grams of protein.

89. Contrary to Defendant's representations, in order to obtain 20 grams of protein, Chobani inflated its serving size beyond the average size under FDA regulations, and an average sized serving contained less than the threshold 20 grams of protein.

90. Defendant failed to disclose these material facts to consumers, including Plaintiff Mercado and the New York Subclass members, and/or made material misrepresentations.

91. Defendant knew or should have known that customers, including Plaintiff Mercado and the New York Subclass members would rely on its representations and omissions of material fact concerning serving sizes and the amount of protein per serving.

92. Defendant's deceptive acts and practices were directed at the public generally and affected consumers and businesses through New York and the United States.

93. As a direct and proximate cause of Defendant's deceptive acts and practices, Plaintiff Mercado and the New York Subclass members suffered injury and ascertainable losses, including the price premium that they paid for the 20G yogurt.

94. Defendant's violations of N.Y. Gen. Bus. Law§349 were substantial factors in Plaintff Mercado's and the NewYork Subclass' injuries.

95. Defendant's violations present a continuing risk to Plaintiff Mercado and the New York Subclass members.

96. Pursuant to N.Y. Gen. Bus. Law §349, Plaintiff Mercado and the N.Y, Subclass members seek actual damages, statutory damages, injunctive relief, and attorneys fees and costs.

<u>Count II</u>
Violation of New York GBL §350
(On behalf of the Plaintiff Mercado and the New York Subclass

97. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

98. New York Gen. Bus. Law §350 provides in relevant part that: "False advertising in the conduct of any business, trade, or commerce . . . in this state is hereby declared unlawful."

99. New York Gen. Bus. Law §350-a (1) provides that false advertising includes the labeling of a commodity.

100. Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its 20G Yogurt.

101. Plaintiff Mercado and the New York Subclass members have been injured by this misleading labeling and advertising as they relied upon it to purchase products that were worth less than as represented. They paid a premium for a product that they did not receive.

102. Defendant's false advertising induced Plaintiff Mercado and the New York Subclass members to by Defendant's 20G Yogurt, and at the prices that they paid.

103. Defendant made untrue or misleading statements in willful, wanton and reckless disregard of the truth.

104. Defendant's conduct constitutes violations of N.Y. Bus. Gen. Code §50.

105. Defendant made these material misrepresentations on its labels and packaging.

106. Defendant's misrepresentations were substantially uniform in content, presentation and impact upon consumers. Moreover, all consumers purchasing the products were and continue to be exposed to Defendant's misrepresentations.

107. As a result of Defendant's recurring, unlawful, deceptive acts and practices, Plaintiff Mercado and members of the New York Subclass are entitled to monetary, statutory and compensatory damages

Count III
Violation of Florida's Deceptive and Unfair Trade Practices Act,
Fla. Stat. §501.201 et seq.
(On behalf of the Plaintiff Lombardo and the Florida Subclass

108. Plaintiff Lombardo repeats and realleges 1-78 above as if fully set forth herein.

109. Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §501.201 et seq., declares "unfair or deceptive acts or practices in the conduct of any trade or

commerce" to be unlawful. Fla. Stat. §501.24(1). The provisions of FDUPTA are to be liberally construed to protect the consuming public from those who are engaged in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. §501.202(2).

110. Plaintiff Lombardo is a consumer under FDUPTA. Fla. Stat. §501.203(7).

111. An act is unfair under FDUPTA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A deceptive act or practice under FDUPTA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment.

112. Chobani has engaged in trade and commerce in the State of Florida, and engaged in deceptive, and/or unconscionable practices within the State of Florida.

113. Chobani improperly and intentionally sold its 20G Yogurt with misleading and deceptive labels and nutritional values, deceiving Plaintiff Lombardo and members of the Florida Subclass about the amount of protein in an average serving of its 20G Yogurt.

114. Violations of any law, statute, rule or regulation that proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute *per se* violations of FDUPTA. Fla. Stat. §501.203(3)(c).

115. Chobani has violated FDUPTA *per se* by employing unfair, deceptive business practices that violate statutes designed to protect public welfare, including but not limited to:

(a) Fla. Stat. §817.0345, prohibiting fraudulent marketing practices, and

(b) Fla. Stat. §817.41, prohibiting misleading and intentional false advertising.

116. Chobani purposely deceived Plaintiff Lombardo into purchasing its 20G Yogurt under the belief that an average serving size contained 20 grams of protein, and/or deceiving Plaintiff Lombardo into paying a premium for the 20G Yogurt.

117. Chobani's deceptive and unfair business practices, including its misrepresentations, have caused economic harm to Plaintiff Lombardo.

118. Chobani's misrepresentations to Plaintiff Lombardo have conferred a benefit upon Chobani which it has knowingly accepted and retained.

119. Plaintiff Lombardo seeks damages in an amount to be determined at trial.

Count IV
Violation of Florida Statute §817.41
(On behalf of the Plaintiff Lombardo and the Florida Subclass)

120. Plaintiff Lombardo repeats and realleges allegations 1-78, and 108-119, as if fully set forth herein.

121. Pursuant to Fla. Stat. §817.41 it is unlawful for any person to make or disseminate or cause to be made before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

122. Chobani committed a deceptive and unfair practice by illegally and falsely advertising or allowing advertising to be disseminated, as set forth above, thus violating Fla. Stat. §817.41.

123. Plaintiff Lombardo has been damaged thereby in an amount to be determined at trial.

Count V

Unjust Enrichment
(On behalf of the Plaintiffs and the Nationwide Class)

124. Plaintiffs repeat and reallege each and every allegation above as if fully alleged herein.

125. Defendant misrepresented to Plaintiffs and Class Members that its 20G Yogurt contained 20 grams of protein per average serving. Defendant misrepresented, concealed and omitted material information concerning the actual grams of protein contained in an average sized serving, and misrepresented and/or inflated the serving size.

126. Plaintiffs and Class Members paid a price premium for yogurt containing 20 grams of protein in each serving, without receiving a product that conformed to Defendant's representations, labeling and advertising.

127. Defendant knowingly and willingly accepted and enjoyed the benefits of the price premium paid by Plaintiffs and Class Members, and other benefits.

128. Defendant's retention of these benefits would be inequitable because Defendant obtained benefits to the detriment of Plaintiffs and Class Members when Plaintiffs and Class Members did not receive the promised benefits.,

129. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members are entitled to restitution.

Jury Demand

Plaintiffs demand a trial by jury.

Prayer for Relief

WHEREFORE, the following relief is requested:

a. An order certifying this Action as a class action, appointing Plaintiffs as class representatives, and their counsel, as class counsel;

b. Awarding Plaintiffs and Class Members damages; attorneys' fees and costs, and incentive fee awards;

c. An order enjoining Defendant from further unlawful conduct, including causing Defendant to change its labeling of its 20G Yogurt or replacing the formulation with a product that does contain 20 grams of protein per average serving under FDA regulations;

d. Awarding interest, as provided by law, including pre-judgment and post-judgment interest; and

e. Such further and other relief as the Court deems proper.

Dated: August 31, 2026

By: /s/ Lynda J. Grant
Lynda J. Grant

**THEGRANTLAWFIRM, PLLC**

521 Fifth Avenue, 17th Floor
New York, NY 10175
t/212-292-4441
f/212-292-4441
e/lgrant@grantfirm.com

*Counsel for Plaintiffs and the Class*